## GOURDIN v. TRENHOLM.

### *EX PARTE* FIRST NATIONAL BANK.

1. Two co-guarantors on a number of bonds fixed by agreement as between themselves the amount of their relative liabilities, and bound themselves to pay each to the other any sum that might be paid by either

in excess of his portion, and interchangeably executed mortgages to secure the fulfilment of this agreement. *Held,* that one of these guarantors had no right of action against the other until his payments exceeded the portion so assumed by him, and then only for the amount of such excess.

2. One of these guarantors having, after maturity, endorsed upon the bonds taken up by his co-guarantor (but to an amount less than his proportion) an acknowledgment that he (the endorser) was liable for a proportionate part thereof, and that his mortgage was a security therefor, such acknowledgment was without consideration and not binding, and certainly could not affect the rights of his then existing creditors. This point was not decided nor even considered by the Supreme Court of the United States in construing this agreement in *Hampton* v. *Phipps,* 108 *U. S.,* 260.

3. As a consideration is necessary to the validity of a contract, it follows that an equitable mortgage based upon an agreement without consideration cannot be set up—certainly not to the prejudice of creditors.

4. A surety cannot enforce contribution from his co-surety until the common debt, for which they are both liable, has been fully paid or satisfied.

5. These bonds, if ever negotiable, lost this quality after maturity; and being paid by one of these guarantors and then reissued by him, this reissue amounted only to an assignment of his rights thereunder.

6. Question reserved, whether a surety who pays a bond debt in the lifetime of his co-surety, ranks as a specialty creditor in claiming contribution from the estate of the deceased co-surety.

Mr. Chief Justice Simpson concurred in the result.

Before Cothran, J., Charleston, November, 1885.

The facts of this case are stated in the opinion. The report of Master Sass upon these facts was as follows:

The present claim is made on behalf of the holders of the B bonds, bearing the special endorsement, to be paid ratably from the fund of $11,535.60, above stated to be the product of the sale of the mortgaged property of Welsman, in preference to the holders of other B bonds, likewise guaranteed by Welsman & Trenholm, but not bearing the same endorsement. The claim for this preference is resisted by the holders of the unendorsed B bonds, and it is upon this question that I have now to pass.

It is urged on behalf of the holders of unendorsed B bonds, that the special endorsement itself shows that Mr. Welsman was under a misapprehension as to his liability, when he made the

endorsement; that as a matter of fact he was not liable, as therein stated, for 31–71 of each bond, but for $310,000 of the whole debt of $710,000; and that the liability of 31–71 applied to another class of indebtedness, as will be seen by reference to the printed memorandum of agreement in evidence; that under said agreement Welsman was not bound to contribute anything to any sums that Trenholm might pay, until Trenholm had paid, and over paid, the amount of $400,000 for which he (Mr. Trenholm) was liable. And it is contended that this was such a misapprehension and mistake as will be regarded in equity as a ground for relief.

With this view I cannot agree. It must be observed that the fraction of 31–71 exactly expresses the proportion which $310,000 bears to the whole debt of $710,000, and there is therefore no necessity to suppose, because of the use of that fraction, that any confusion existed in Welsman's mind between his two liabilities upon the two classes of bonds. Granting the intention to apply the proportionate liability to each bond as stated in the endorsement, the fraction used is the proper fraction to express it. It will not be contended that Welsman's liability for the $310,000 was subsequent to that of Trenholm for the $400,000. They both subsisted together, and the proportion applied practically to each bond as fully as it did to the whole sum, if the parties chose so to apply it. I cannot therefore hold that Mr. Welsman "did not know what he was doing," and was *inops consilii* when he placed this endorsement upon these bonds. It seems to me from an examination of the whole matter, that he intended to do what the plain language of the endorsement implies, to acknowledge his liability to Mr. Trenholm for 31–71 of each bond bearing the endorsement, and to declare Mr. Trenholm entitled *pro tanto* to the security of the general mortgage.

But whatever was Mr. Welsman's intention, the mortgages in question have received judicial construction from the highest court in the land, and it has been decided by the Supreme Court of the United States that the condition of the mortgages has not been broken, and that neither surety can claim indemnity against the other for an overpayment. As the bearing of this endorsement upon the question of the mortgages was clearly stated in

the report of special master Lord as giving a practical construction of the contract by the parties themselves, and as this construction has been overruled by the decree of the Supreme Court reversing the report and decree below, I must hold the question to be *res adjudicata*, and it becomes necessary therefore to interpret the endorsement conformably with and in the light of the decision of the Supreme Court.

There is but one method by which the two can be reconciled. It must be taken for granted that the security of the mortgage spoken of in the endorsement was to take effect only when the condition of the mortgage should be broken, that is to say, when in the course of this process of redeeming the bonds one by one, the point should be reached at which Mr. Trenholm should have redeemed more than his proportion of the joint debt. This point never having been reached, the condition of the mortgage has never been broken, and Mr. Trenholm's right to enforce its security never took effect. So regarded, the endorsement becomes simply an acknowledgment by Welsman to Trenholm that the former's liability upon the bond had been paid by the latter.

Such being, then, the purpose and effect of the endorsement, with what rights did it clothe Mr. Trenholm? Plainly with the rights only of a simple contract creditor. Trenholm and Welsman were co-sureties upon the B bonds. They were jointly and severally liable for the payment of the whole issue. As between themselves they might agree to divide their liability in whatever proportions they pleased, but to the bondholders they were jointly and severally liable. Now, if one of two co-sureties pays the obligation, he is entitled to recover from the surety in default his proportion of the debt, but such claim ranks only as a simple contract debt. "A surety paying a bond debt will be treated in marshalling assets as a mere simple contract creditor." *Story Eq. Jur.*, § 499 (d), and cases quoted. In *Bank* v. *Adger*, 2 *Hill Ch.*, 266, Judge O'Neall says: "It was an entire debt due by all or either of the obligors; payment of it by one of the co-sureties entitled him to contribution as for so much money paid, laid out, and expended, and the debt thus due to him by his co-surety is a mere simple contract. This was ruled by Lord Chancellor Eldon in *Copps* v. *Middleton*, 1 *Turn. & R.*, 224."

Mr. Trenholm could not recover upon the bond against Mr. Welsman's estate, for he had paid the bond, and in the language of Lord Eldon, "it is gone and cannot be set up." Nor can the mortgage avail him, for it has been declared by the highest authority to be inoperative and unenforcible. He must rank, therefore, as a simple contract creditor, and his assigns can have no higher right than he himself had. The contention of the endorsed bondholders that they are *bona fide* holders of negotiable securities for value without notice cannot be sustained. The endorsement was placed upon the bonds after maturity, and the holders took them subject to all the equities between the parties. The very terms of the endorsement showed that the bond had been paid by Mr. Trenholm and had been re-issued as his individual liability. How, therefore, could such a bond be entitled to priority of payment out of the estate of the original guarantor over other bonds of equal date and rank which had not been paid? This court is administering the assets of Mr. Welsman's estate among his creditors. I cannot see how the specialty creditors, holders of the original issue of B bonds, guaranteed by Mr. Welsman, can be postponed in such administration to the holders of certain others of the same bonds through and by means of any act of such guarantor subsequent to the original guarantee.

Even if the endorsement was intended to have the effect of an equitable mortgage, as has been contended, it could not avail as against the bondholders. The endorsement of a negotiable security after it is due and dishonored, is a new and independent contract between the immediate parties. The holders of these endorsed bonds stand here, by their own claim, as Mr. Trenholm's assigns, and they can urge no higher claim than could have been set up by Mr. Trenholm himself. I hold, therefore, that the bonds bearing the special endorsement are not entitled to any preference or priority over the other B bonds proved in this case. And I so report.

Upon exceptions to this report, his honor filed the following decree:

After careful consideration of the pleadings in this case, the report of the master, the exceptions thereto, and the exhaustive

arguments of counsel, I am constrained to adopt the conclusions of the master as enunciated in his very able report.

I do not agree altogether with him in the view which he has taken of the nature and effect of the special endorsements made by James T. Welsman upon the bonds held and produced by the intervenors.   These endorsements seem to me to be more in the nature of a *memorandum* for future and convenient use by Mr. George A. Trenholm, after he should have consummated the gigantic and impracticable scheme upon which he had entered, of paying off the indebtedness of $710,000, which he was able only partly to accomplish.   But without elaborating my views upon this point, which would in the end consist with the master's conclusions in the main issue, I deem it sufficient and altogether consistent with my own convictions, to affirm his report and to make the same the judgment of this court.   And it is so ordered and adjudged.

From this decree the First National Bank of Charleston and the South Carolina Loan and Trust Company appealed upon the following exceptions:

1. Because it is error of the presiding judge to confirm the report of the master, and make it the judgment of the court; and this because of matters outside of the case made in the pleadings; and which are not legally admissible in the case of a contract, expressed in terms clear and without ambiguity; and those terms being the highest evidence of the intention of James T. Welsman in the contract so made, as also of the proper interpretation of it.

2. Because the master in his report erred, and the presiding judge, in confirming that report, also erred, in holding that this case was decided by the Supreme Court of the United States in the case of Hampton, Adm'r, *et al. v.* Phipps, when the decision in that case in no manner related to the special contract, made in the endorsement of James T. Welsman on the bonds now before the court; nor was the same referred to in the record or in the judgment of the Supreme Court of the United States.

3. Because the terms in that endorsement were clear, positive, and freed from all ambiguity; and with the acknowledgment by James T. Welsman of his indebtedness to George A. Trenholm, and his plainly expressed intention to secure the payment of that

indebtedness, when he designated the security he then gave to make certain the payment of that indebtedness; and in such terms that he and the holder of the bond plainly understood what was that security.

4. Because by the conditions, subject to which only, according to the decision of the Supreme Court of the United States, the mortgages between George A. Trenholm and James T. Welsman could be enforced by the creditors of either against the other, under the principle of subrogation; and the bankruptcy of George A. Trenholm and James T. Welsman, which made the performance of such conditions impossible; it then became competent for either of these parties, by any other declaration, to subject the property of either to such other charges as the said George A. Trenholm or James T. Welsman chose to make. And this right was exercised by James T. Welsman in the endorsement he made on these particular bonds.

5. Because in the exercise of the power so belonging to the said James T. Welsman, he did give to the First National Bank of Charleston, and other holders of bonds with the like endorsement, in that endorsement a plain acknowledgment of indebtedness and to secure that indebtedness; and did for this purpose sufficiently and clearly designate the security so given.

6. Because the said James T. Welsman did not, during his lifetime in any manner, question or express a wish that the endorsement on these bonds should be construed otherwise and enforced than according to the plain intent and meaning of the terms used in such endorsement.

7. Because this endorsement on a bond, of which the holder is lawfully and for value in possession, carried with it to such holder all the security attached to or connected with the said bond; and intended and accepted as having added value given to the bond because of such security.

8. Because in this case the holders of bonds with such endorsement have all the rights, and are entitled to all the remedies, which in equity are applied in the cases of an equitable mortgage.

9. Because the presiding judge, in confirming the report of the master, has erred in his conclusion of law, that the holders of these bonds rank only as simple contract creditors; whereas the

rule in this State is distinctly the reverse of that stated by the master, and erroneously accepted by the presiding judge as the law in this State.

10. Because the decree in this case should be, that the holders of the bonds, with the special endorsement thereon, are entitled to be paid out of the fund in court, the same being the proceeds of the sales of the real estate referred to in that endorsement as the security for the payment of these bonds.

The respondents submitted the following additional grounds in support of the Circuit decree:

1. That the said master should have found that Welsman was not bound to contribute anything to any sums that Trenholm might pay, until Trenholm had paid and overpaid the amount of four hundred thousand dollars, for which he (Mr. Trenholm) was liable.

2. That the said master should have found that the endorsement stating that Mr. Welsman was so liable, made by him on certain bonds which had been paid by Mr. Trenholm, was made under a clear mistake and misapprehension on the part of Mr. Welsman, against which equity will relieve the creditors of Welsman.

3. That the said master erred in holding that there is no necessity to suppose, because of the use of the fraction 31–71, that any confusion existed in Welsman's mind between his two liabilities upon the two classes of bonds.

4. That the master erred in holding that the proportion applied practically to each bond as fully as it did to the whole sum, if the parties chose to so apply it, and that it was so applied.

5. That the master erred in holding that endorsement created any liability on the part of Mr. Welsman to Mr. Trenholm.

6. That the master erred in holding that the bonds paid by Mr. Trenholm had been reissued by him or as his individual liability.

*Messrs. Buist & Buist* and *A. G. Magrath*, for appellants.

*Messrs. Simonton & Barker, DeSaussure & Son, B. H. Rutledge*, and *E. McCrady, jr.*, contra.

24

October 11, 1886.  The opinion of the court was delivered by MR. JUSTICE MCIVER.  For the purpose of settling with the creditors of John Fraser & Co. and Fraser, Trenholm & Co., two of the partners in those houses, to wit, W. L. Trenholm and Theodore D. Wagner, executed a number of bonds, aggregating in the whole the sum of seven hundred and ten thousand dollars, by which they bound themselves, jointly and severally, to pay to James Robb and Charles T. Lowndes, as trustees, or the survivor of them, their assigns or the assigns of the survivor, the amount named in each of said bonds, at the several dates named therein, the last of said dates being the first day of January, 1873.  Upon these bonds George A. Trenholm and James T. Welsman, by their endorsement under their hands and seals, guaranteed the payment thereof.  These bonds were known and designated as B bonds, and the following endorsement was placed thereon by the trustees above named, viz.: "The within bond being exchanged for bills and claims under the agreement herein referred to, is assigned, set over, and transferred, and payment directed to be made to the holder hereof."  To make good an unexpected deficiency in the assets of Fraser, Trenholm & Co., another lot of bonds, designated as C bonds, were issued by George A. Trenholm and James T Welsman, which, however, are not involved in this case.

On May 3, 1869, George A. Trenholm and James T. Welsman entered into a written agreement, a copy of which is set out in the record, by which it is declared that the said parties "did, between themselves, agree that the limit and extent of the amounts for which each of them would respectively be liable should be as follows, that is to say, of the said sum of seven hundred and ten thousand dollars (the B bonds), that the said George A. Trenholm should be liable for the sum of four hundred thousand dollars, and the said James T. Welsman for the sum of three hundred and ten thousand dollars, and that in the obligation to be given under the second article of the said memorandum of final settlement of the sixteenth November, Anno Domini one thousand eight hundred and sixty-eight (the C bonds), the said George A. Trenholm should be liable for forty of seventy-one parts thereof, and the said James T. Welsman should be liable for thirty-one of seventy-one

parts thereof, * * with the clear understanding and agreement that each would be respectively liable to the other for the full discharge of the said sum and the said proportion by them respectively undertaken, and that each would save and keep harmless and indemnified the other from all claim, demand, or damage for or by reason of the said guaranty and endorsement, and of such obligation, beyond the amount or proportion by each respectively assumed as hereinbefore stated."

It is further declared in the said agreement that the foregoing "does fully and truly recite and set forth the amounts and proportions for which each as to the other is respectively liable, because of the said guaranty and endorsement, and the said obligation by them made and undertaken, and that each is as to the other bound fully to discharge and satisfy such amount and such proportion as is hereinbefore recited and set forth as so undertaken by each as to the amount and proportion for which he is liable, and that each will save and keep harmless and indemnified the other from all demand and damage for or by reason of the amount or proportion so undertaken by him." The agreement also provided that each should execute to the other a mortgage for his more perfect indemnity. In pursuance thereof the said parties did, on the same day, to wit, May 3, 1869, execute each to the other a mortgage to secure the performance of the covenants contained in said agreement.

In January, 1873, after the maturity of the B bonds, James T. Welsman signed the following endorsement, printed on certain of those bonds, to wit: "The proportion of the within bond for which the within bound James T. Welsman is liable, that is to say, thirty one of seventy-one parts thereof, having been paid by George A. Trenholm, for that sum, with interest, James T. Welsman is indebted to George A. Trenholm, and the mortgage from James T. Welsman to George A. Trenholm, bearing date May 3d, A. D. 1869, and recorded in the mesne conveyance office, Charleston County, in book H., No. 15, page 571, is acknowledged by James T. Welsman to be security for the same to the said George A. Trenholm or his assigns."

George A. Trenholm died on November 17, 1876, without ever having paid his proportion of the B bonds, and it is con-

ceded that his estate is insolvent and utterly unable to pay such proportion. James T. Welsman died July 17, 1877, without ever having paid his proportion of the B bonds, and it is likewise conceded that his estate is utterly insolvent and will never be able to pay his proportion of said bonds.

Sometime in 1878, certain holders of bonds guaranteed by Trenholm and Welsman, filed a creditors' bill in the Circuit Court of the United States, claiming the benefit of the mortgages of May 3, 1869, given by Trenholm and Welsman, each to the other. This claim was resisted by Hampton, a judgment creditor of both Trenholm and Welsman, whose judgment was junior in date to said mortgages, and by the executor of James Welsman, the father of James T. Welsman, who held a mortgage executed in 1871, upon some of the property embraced in the mortgage of Trenholm to Welsman, dated in May, 1869. The Circuit Court sustained the claim of the bondholders and ordered a sale of the property covered by the mortgages. This decree was, however, reversed by the Supreme Court (see *Hampton* v. *Phipps*, 108 *U. S.*, 260), and under that decision the Circuit Court of the United States ordered the balance of the funds in the hands of the referee, arising from the sales of the property of Welsman embraced in the mortgage to Trenholm, to be transferred to the State court, there to be applied in due course of administration. This balance, amounting to something over eleven thousand dollars, is now in the hands of the master, and constitutes the fund over which the present controversy has arisen.

The appellants, as holders of certain of the B bonds, bearing the endorsement placed upon them by Welsman, a copy of which is hereinbefore set out, claim that they have a prior lien upon the fund in controversy by reason of such endorsement, and this claim is resisted by the holders of B bonds upon which there is no such endorsement. The master, to whom the issues were referred, for the reasons stated in his report, which is set out in the record, disallowed the claim of the appellants and held that they could only claim as simple contract creditors of the estate of Welsman. The Circuit Judge, while not endorsing all the reasoning of the master, overruled the exceptions and confirmed

the report.   From this judgment the holders of the bonds bear-
ing the Welsman endorsement appeal upon the several grounds
set out in the "Case," and the unendorsed bondholders, accord-
ing to the proper practice, give notice that they will undertake to
sustain the judgment confirming the master's report, upon
grounds other than those upon which the master bases his con-
clusion.

We do not propose to consider these grounds *seriatim,* but
shall confine ourselves to the consideration of those questions
which arise upon the record and are material to a proper decision
of the case.   We may say, however, in the outset, that we do
not agree with the master in holding that the question is *res
adjudicata* by the decision of the Supreme Court of the United
States.   That court simply held that under the case as presented
to it, the right of subrogation set up by the bondholders could
not arise, because by a proper construction of the terms of the
mortgages of May 3, 1869, they were only intended to indem-
nify the said parties for any excess beyond the sum or propor-
tion which each had assumed to pay, and as it was conceded that
neither had paid nor could pay anything in excess of the sum or
proportion he had assumed, no liability from one to the other
had arisen or could arise, and hence there was nothing upon
which either could base a claim for indemnity, and therefore
nothing upon which either mortgage could be rendered operative.
As was said by the court: "Unless one of them had been com-
pelled to pay, and had in fact paid, an excess beyond his agreed
share of the debt, there could have been no breach of the condi-
tions of the mortgage, and consequently no right to a foreclosure
and sale of the mortgaged premises.   *   *   *   The mortgages
were not created for the security of the principal debt, but as a
security for a debt possibly to arise from one surety to the other;"
and as under the conceded facts of that case such possible debt
had not then arisen and could not afterwards arise, inasmuch as
neither party had paid or could pay anything in excess of his
share, the conclusion necessarily followed that there was no debt
and no liability from one to the other, and therefore nothing to
support either mortgage.   As the court in that case well said:
"There is, therefore, no right to the subrogation insisted on,

because there is nothing to which it can apply." In this view we entirely concur, but in that case the question of the effect of the Welsman endorsement, upon which the appellants now rely, does not seem to have been raised, and no allusion seems to have been made to it in the opinion of the court.

Indeed, we do not see how it would have been pertinent to the question which the Supreme Court of the United States was called upon to determine. As we understand it, the controversy there was between the B bondholders as a class, and certain lien creditors, whose liens arose subsequent to the date of the mortgages of May 3, 1869, *but prior to January, 1873,* when the Welsman endorsement was placed upon certain of the B bonds, under which appellants now set up their claim. Hence, in that controversy, it was not necessary or important to determine the effect of the Welsman endorsement; for, even giving it the full effect now claimed for it by the appellants, it certainly could not override the previous liens created by Hampton's judgment, which was recovered on June 19, 1869, or the mortgage to the elder Welsman, executed June 13, 1871. We do not think, therefore, that the question presented in this case can be regarded as *res adjudicata* by the decision of the Supreme Court of the United States in *Hampton* v. *Phipps, supra.* It certainly was not in terms decided or even alluded to in the opinion of the court, and according to our view it was not even pertinent to the question there raised.

A good deal has been said as to what were the intentions of Welsman when he signed the endorsement on the bonds in question, and as to whether he was not then under a mistake as to his liability to his co-guarantor or co-surety, Trenholm, for that was really the true relation in which these parties stood to each other; but according to the view which we take of the case it will not be important to determine these questions. Assuming, then, for the purposes of this inquiry, that Welsman when he signed the endorsement intended precisely what the words there used import, and that his purpose was to admit an indebtedness to Trenholm to an amount represented by a specified fractional part of the bond, and to acknowledge that such indebtedness was secured by the mortgage, we propose to consider what are the rights of the

parties. There can be no doubt that Trenholm and Welsman, practically as co-sureties on the bonds, were each liable to the lawful holders thereof for the full amount of the bonds ; but, in the absence of any special agreement between themselves, they would each be liable, as between themselves, for only one-half of the full amount. Hence if either one of them paid the full amount of the bonds, he would have a valid claim against the other for one half of the amount so paid.

But it is equally true that this relative liability, as between themselves, might be fixed by special agreement at a different proportion from one-half. It is an undoubted fact in this case that these parties did exercise this right, and did by special agreement in writing and under seal, fix their relative liability each to the other, and it is a circumstance not without significance, that in doing so they fixed their relative liability so far as the B bonds were concerned (the ones out of which this controversy arises), at specified sums of money, and not as in case of the C bonds at fractional parts of the whole debt. It seems to us that the true import and meaning of this agreement, a copy of which is set out in the record, is that, while, of course, Trenholm and Welsman were each liable to the bondholders for the full amount thereof, yet as between themselves they had divided the debt into two portions—one of four hundred thousand dollars, for which Trenholm alone was responsible, and the other of three hundred and ten thousand dollars, for which Welsman alone was responsible. In other words, that as between these parties there were two debts—one of $400,000, and the other of $310,000, the former due by Trenholm and the latter by Welsman, and that until one paid some portion of the liability of the other, he could have no claim upon the other.

This seems to us the necessary construction of the words used by the parties in the agreement, for the liability of each to the other is expressly declared to be a liability for any amount "beyond the amount" which each had respectively assumed to pay. It is quite clear, therefore, that under the terms of this agreement, Trenholm could have no claim whatever against Welsman until he had paid something in excess of four hundred thousand dollars, and then only for such excess, and as it is conceded that

he never did pay as much as $400,000, it is quite clear that Welsman never was under any legal, or even moral, obligation to pay Trenholm anything by reason of their co-suretyship on the B bonds under the express terms of the agreement defining their relations in reference to that matter.

This being so, even if the endorsement placed upon certain of these bonds by Welsman should be construed as an agreement to pay to Trenholm thirty-one of seventy-one parts of each bond upon which it was placed, it follows that there was no consideration whatever for such agreement; there was no antecedent liability which could constitute such consideration, and it is not pretended that any consideration passed at the time the endorsement was placed upon the bonds, and it not being under seal, it must be regarded as a mere *nudum pactum.* It cannot be said that Trenholm's right to call on his co-surety, Welsman, for contribution constituted a sufficient consideration for the agreement contained in the endorsement, because no such right did then or has ever existed.

In 3 *Pomeroy Equity Jurisprudence,* section 1418, this right of contribution between co-sureties is defined as follows: "Where there are two or more sureties for the same principal debtor, and for the same debt or obligation, whether on the same or on different instruments, *and one of them has actually paid or satisfied more than his proportionate share of the debt or obligation* (the italics being ours), he is entitled to a contribution from each and all of• his co-sureties in order to reimburse him for the excess paid over his share, and thus to equalize their common burdens. * * * The right, however, may be controlled or modified by express agreement among the co-sureties or debtors." Now, Trenholm, as we have seen, not having paid "more than his proportionate share of the debt or obligation," as fixed by the special agreement of the parties, there is no excess over his share for which he could call on Welsman to reimburse him. The endorsement placed upon certain of the B bonds cannot, therefore, be regarded as anything more than an agreement by Welsman, without any consideration, to pay to Trenholm a certain proportion of each bond so endorsed, and an acknowledgment that the performance of such promise is to be secured by the mortgage of May 3, 1869.

The want of consideration, if nothing else, would be sufficient to prevent such an agreement from being set up as an equitable mortgage, in derogation of the rights of *bona fide* creditors. As is said in 3 *Pom. Eq. Jur.*, § 1234: "The theory of equitable liens has its ultimate foundation, therefore, in contracts express or implied;" and as a consideration is necessary to the validity of a contract, it follows that an equitable mortgage based upon an agreement without consideration cannot be set up, certainly not to the prejudice of creditors. Indeed, the Court of Equity will not enforce a *voluntary* trust, however meritorious the objects of it may be, as long as it is merely "executory, incomplete, imperfect, or promissory." 2 *Pom. Eq. Jur.*, § 997, and 1 *Story Eq. Jur.*, §§ 433, 987. But more than this, Welsman, being in debt at the time, could not, even by a formal mortgage, without any consideration, fix a lien on his property which could take precedence of such debts.

But even if Trenholm had paid more than his proportion of the debt, and thereby acquired the right to call upon his co-surety, Welsman, for contribution, he could not enforce this right to the prejudice of the common creditor. The right of contribution, resting, as it does, upon principles of equity and not upon contract, will not be enforced by a Court of Equity to the injury of the prior and higher rights of the creditor to be paid his debt in full, for which he has a right to look to *all* the sureties. Hence a surety cannot enforce contribution from his co-surety until the common debt, for which they are both liable, has been fully paid or satisfied in some way. *Dering* v. *Earl of Winchelsea*, 1 *Wh. & Tud. Lead. Cas. Eq.*, *100, and the notes to that case. It seems to us clear, therefore, that in no view of the case could Trenholm, by virtue of the endorsement placed upon certain of the B bonds or otherwise, successfully claim a right to priority of payment out of the proceeds of the sale of the property covered by the Welsman mortgage.

And we think it equally clear that the appellants, claiming, as they must do, through Trenholm, as his assignees, can have no higher rights than he had. The appellants certainly cannot claim to be purchasers of negotiable securities; for even assuming that the bonds were made negotiable by the endorsement placed upon

them by the trustees (as to which, however, we do not feel called upon to express any opinion), they acquired possession of them after they became due, and after they had lost their negotiable character, if they ever had any. But, in fact, the appellants never became the purchasers of the bonds *as such.* When Trenholm paid these bonds, they lost their character as bonds, certainly their negotiability, and by what right he, or his representative after his death, could re-issue them *as bonds*, we are at a loss to conceive. They were in Trenholm's hand, after payment of them by him, nothing more than evidences of indebtedness to him by the principal obligors and by his co surety, which, in the strongest view which can be taken for appellants, he could, by virtue of the equitable doctrine of subrogation, set up against them as specialty claims; but they certainly had none of the features of negotiable securities. When, therefore, these bonds were re-issued, as it is said, by Trenholm, or by his representative after his death, it amounted to nothing more than a transfer of *such claims*—not of the bonds *as such*—to the persons to whom they were delivered. Assuming, then, for the purposes of this case *only*, without considering the question that such claims could be and were properly assigned to the appellants, it is manifest that their position is that of assignees of unnegotiable claims, and their rights can be no higher or better than those of their assignor.

From the foregoing views it follows that the appellants, as holders of the papers originally issued as B bonds, which now bear the special endorsement placed upon them by Welsman, have no claim upon the fund in controversy; and as, by the judgment appealed from, they have been practically excluded from any participation therein by being placed in the rank of simple contract creditors, and as the respondents, while not appealing from the judgment below, have given notice that they would ask this court to sustain said judgment upon other grounds than those upon which it was based, one of which was that the special endorsement placed upon the bonds now sought to be set up by appellants, created no liability on the part of Welsman to Trenholm, we feel warranted in simply affirming the judgment. In doing so, however, we do not wish to be understood as endorsing

the proposition that where one of two sureties pays a bond debt, in claiming contribution from the estate of his co-surety he can rank only as a simple contract creditor. Upon that question the authorities in this State, as well as elsewhere, are conflicting, and we prefer to reserve our opinion until a proper case for its decision arises.

The judgment of this court is, that the judgment of the Circuit Court, with the reservation above mentioned, be affirmed.

MR. JUSTICE MCGOWAN concurred.

MR. CHIEF JUSTICE SIMPSON concurred in the result.